IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOAO BOCK TRANSACTION )
SYSTEMS, LLC, )
 )
    Plaintiff, )
 )
v. ) Civ. No. 12-1138-SLR
 )
JACK HENRY & ASSOCIATES, INC., )
 )
    Defendant. )
 )

**MEMORANDUM ORDER**

At Wilmington this 30th day of June, 2014, having heard argument on, and having reviewed the papers submitted in connection with, the parties' proposed claim construction;

IT IS ORDERED that the disputed claim language[1] of United States Patent No. 7,096,003 ("the '003 patent") shall be construed as follows:

1. **Background.** On September 14, 2012, Joao Bock Transaction Systems, LLC ("plaintiff") filed a complaint against defendant Jack Henry & Associates, Inc. ("defendant"), alleging that certain of defendant's products, "such as but not limited to its 'goDough' and 'NetTeller Online Banking'" products, infringe the '003 patent. (D.I. 1) On December 3, 2012, defendant answered and counterclaimed. (D.I. 6) The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2. **Standard.** Claim construction is a matter of law. *Phillips v. AWH Corp.*, 415

---

[1]The parties have stipulated to the limitation "automatically" to mean "without human intervention." (*See* D.I. 122, ex. A at 11)

F.3d 1303, 1330 (Fed. Cir. 2005) (en banc). Claim construction focuses on intrinsic evidence - the claims, specification and prosecution history - because intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

3. The claim construction exercise starts with the "words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582. Words in a claim are generally given the ordinary and customary meaning that "the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

As explained by the Federal Circuit in *Phillips*, the claims

> do not stand alone. Rather, they are part of "a fully integrated written instrument," . . . consisting principally of a specification that concludes with the claims. For that reason, claims "must be read in view of the specification, of which they are a part.". . . . As we stated in *Vitronics,* the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed claim.

*Phillips*, 415 F.3d at 1315 (citations omitted).

> Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent. . . . Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent. Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final

2

> product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. . . . Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

*Id.* at 1317 (citations omitted).

4. The Federal Circuit recognizes that either the specification or the prosecution history "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Id.* at 1316. "In such cases, the inventor's lexicography governs," *id.*, "as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582. *See also Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning.") (citation omitted). Particularly when a special definition of a term is added through amendment, such a definition must be consistent with the use of that term in the application as filed; otherwise, the added definition would constitute "'new matter' within the meaning of 35 U.S.C. § 132 and must be disregarded in construing the scope and meaning of the claims." *Dresser Industries, Inc. v. United States*, 432 F.2d 787, 793 (Ct. Cl. 1970) (citations omitted).

5. There is no dispute that a patent's claims are "of primary importance, in the effort to ascertain precisely what it is that is patented." *Merrill v. Yeomans,* 94 U.S. 568, 570 (1876). The Supreme Court has explained over the years that, "[b]ecause the

patentee is required to 'define precisely what his invention is,' . . . it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Phillips*, 415 F.3d at 1312 (citing *White v. Dunbar*, 119 U.S. 47, 52 (1886)). In one of its recent decisions relating to the requirements for patentability, the Supreme Court reiterated the public notice function of patents, explaining that "a patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'" *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) (citations omitted). In balancing the need for clarity with the inherent limitations of the English language, the Supreme Court declared that 35 U.S.C. § 112, ¶ 2 requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.*

6. The patentees at bar have managed to turn the above principles on their head. In this regard, they assert that the '003 patent should be recognized as having a priority date of August 8, 1996, the earliest filing date of its related patents, thus also establishing the temporal perspective for those of skill in the art. Without addressing in this order the question of whether the definitions constitute new matter and, therefore, support a later priority date, the court will address the extent to which, if at all, the court is bound by the multiple definitions the patentees choose to give certain claim language during the claim amendment process that took place in the PTO from October 2004 to September 2005. The definitions were not included in the specification, were not the subject of any commentary by the examiner, were made years after the earliest priority date, and were added for litigation purposes, that is, to differentiate the '003 patent from

4

a related patent.[2] Most significantly, the definitions added through the auspices of 37 C.F.R. 1.115 are worded in the disjunctive and, rather than narrowing the scope of the claim language or adding clarity to such, instead obscure the scope of the claims, thus confounding the public notice requirement of § 112, ¶ 2. Given that the definitions are not "clearly stated," see Vitronics, 90 F.3d at 1582, the court rejects plaintiff's argument that the court is obligated to embrace them for purposes of the claim construction exercise.

7. The court, therefore, construes the disputed claim language consistent with the above-mentioned tenets of claim construction:

**a. "At least one of . . . and:"**[3] "One or more of the items in the list." This construction is consistent with the claim language, which describes lists having two or more components. (See, e.g., '003 patent,[4] cols. 47:30-32; 47:66-48:4; 56:65-57:10; 83:21-84:5) This is further supported by the specification in which the patentees used either disjunctive, or both conjunctive and disjunctive language to describe the present invention. (See, e.g., id. at abstract, cols. 4:21-22; 10:3-14 (referring to the Internet and/or the World Wide Web); 7:58-67 (referring to each authorized vendor, seller, and/or services provider, as well as the amount of the transaction, the parties involved, the geographical area limitation and/or the times of allowed usage); 20:63-21:10

---

[2]U.S. Patent No. 6,529,725 ("the '725 patent"), which was found to be invalid by the Federal Circuit, Joao Bock Transaction Systems, LLC v. Sleepy Hollow Bank, 445 Fed. Appx. 359 (Fed. Cir. 2011).

[3]Claims 30, 34, 41, 102, 122, 331, 317, 414, 415, 417, 422, 423.

[4]All citations are to the '003 patent unless otherwise noted.

5

(referring to a checking account, savings account, and/or ATM account)).

        **b. "Communication device:"**[5] "A device for transmitting and receiving signals, data, or information." This construction is supported by the language of the claims. (See, e.g., cols. 47:28-29 reciting "the limitation or restriction is transmitted from a communication device" indicating the presence of a transmitter; and 47:45-49 reciting "the transmitter transmits a second signal to the communication device" indicating the presence of a receiver) In further support of the above construction, the specification describes a communication device "which may receive signals and/or data from either or both of the point-of-sale terminal and/or the central processing computer." (Col. 4:49-52) Additionally, it states that the

> communication device may also be equipped with a transmitter for transmitting signals and/or data to the central processing computer. In this regard, the central processing computer transmits signals and/or data to the communication device as well as receives signals and/or data from the communication device. The communication device may also transmit signals and/or data directly to the point-of-sale terminal and receive signals and/or data directly from the point-of-sale terminal.

(Cols. 4:52-60; see also col. 6:22-47 stating that "the information and/or data transmitted to the communication device includes information and/or data identifying the transaction") That the communication device receives or transmits signals or data is also supported by figures 2 and 5, which indicate that the communication device is equipped with both a receiver and a transmitter.

---

[5]Claims 30, 31, 43, 102, 106, 317, 342, 343, 414, 415, 416, 417.

  c. **"Processes" and "Processing:"**[6] "Operations on data or information, or the performance of a series of actions or operations directed toward a particular result;" and "operating on data or information, or to perform a series of actions or operations directed toward a particular result." As the court finds plaintiff's construction to be overly broad, and defendant did not provide argument or propose a construction other than plain and ordinary meaning for these limitations, the court construes them consistent with the parties' stipulation for the limitation "processing" in *Joao v. Sleepy Hollow Bank*, 348 F. Supp. 2d 120, 128 (S.D.N.Y. 2004).

  d. **"Receiver:"**[7] "The part of a transaction device,[8] central processing computer, or communication device that receives signals, data, or information from another device." The support described for "communication device" pertains to this limitation as well.

  e. **"Signal:"**[9] "An electromagnetic transmission containing data or

---

[6]Claims 30, 102, 317, 414, 415, 422.

[7]Claims 30, 102, 414, 415.

[8]The specification seems to disclose the generic term "transaction device" (col. 79:10-11) to mean at least one of: "a banking transaction device, a banking transaction terminal, a teller terminal, a teller work station, a processing computer terminal, an automated teller machine terminal, a cashier work station, and an over-the-counter transaction device" (col. 45:35-41); "a point-of-sale authorization device, a point-of-sale authorization terminal, a transaction authorization device, a credit card authorization device, a charge card authorization device, and a debit card authorization device" (col. 80:35-40); or another device that can conduct a "point-of-sale transaction, a telephone order, [or] a mail order." (Col. 76:28-30) As disclosed in figures 7, 8, 9A, 9B, and 9C (and their descriptions), a transaction device also includes a cellular telephone. (Cols. 28:66-35:18)

[9]Claims 30, 31, 102, 106, 317, 414, 415, 423.

7

information." This is consistent with the claim language which recites, for example, "the processing device generates a signal containing information for allowing or disallowing the banking transaction" (col. 47:41-43); and "the processing device generates a signal containing information for authorizing or disallowing the transaction." (Col. 55:29-31)

    **f. "Transmitter:"**[10] "The part of a transaction device, central processing computer or communication device that sends signals, data, or information to another device." The support described for "communication device" pertains to this limitation as well.

    **g. "Banking Transaction:"**[11] "An activity affecting or involving a deposit account." This construction is supported by the language of the claims and the specification. Claim 30, for example, describes a banking transaction as involving a "withdrawal from a checking account or a cashing of a check on a checking account." (Col. 47:22-24) Claim 414 describes "a banking transaction involv[ing] at least one of a checking account, a savings account, and an automated teller machine account." (Col. 83:24-26) The specification further describes a particular embodiment of the present invention in which the apparatus of the present invention "is utilized in conjunction with a checking account, savings account and/or ATM account . . . (hereinafter referred to as a "banking transaction") and/or the authorization process involved therewith." (Col. 20:64-21:1) Banking transactions are performed at banking or financial establishments. (Col. 21:1-18)

---

[10] Claims 31, 34, 41, 106, 317, 414.

[11] Claims 30, 31, 414, 415, 418, 419, 420.

8

A bank account is one from which an individual may withdraw, or into which an individual may deposit, money. (*See* col. 1:55-57) A deposit account is a type of account at a banking institution that allows money to be deposited and withdrawn by the account holder, and includes (but is not limited to) a checking account, a money market account, and a savings account.

**h. "Central Transaction Processing Computer:"**[12] "A computer through which banking or other transactions are processed." The term "central transaction processing computer" appears only in the abstract, which was added by amendment in 2004, and is also found in asserted claim 317 of the '003 patent. The court, therefore, looks to the specification's description of central processing computer, which performs the function of transaction processing, to discern the meaning of "central transaction processing computer" as used in the claims.

The specification teaches that the central processing computer processes "credit, charge, debit . . . and/or other transaction requests," and "data and/or information pertaining thereto." (Col. 4:23-34) "The point-of-sale terminal is linked and/or connected to the central processing computer via a communications system" and "transmits signals and/or data to the central processing computer as well as receives signals and/or data from the central processing computer. . . ." (Cols. 4:35-36; 45-47) Additionally, the specification describes a communication device which may receive from or transmit signals and/or data to the central processing computer. (*See* col. 4:50-60) The specification further teaches that the central processing computer

---

[12]Claim 317.

may be linked wirelessly to a communication device (*see* cols. 4:66-5:6) or via any suitable communication system (*see* col. 5:8-23) "so that the central processing computer may transmit signals and/or data to the communication device so as to communicat[e] with the cardholder . . . ." (Col. 5:4-6) In this sense, the specification and the figures (*see, e.g.*, figs. 1-2, 4-5) describe the central processing computer as the point central to the apparatus that collects data from point-of-sale devices, banking transaction terminals, and customer communication devices; processes transactions; and communicates with the communication device to provide information to an account holder. As the central transaction processing computer performs the same function as the central processing computer as described in the specification, the court finds that the central transaction processing computer is equivalent to the central processing computer.

   i. **"Electronic mail message:"**[13] "A communication sent to an email address." This construction is supported by the specification in which an electronic mail message is included in a list of transmissions. (*See* cols. 10:53-67; 39:4-7, 57-62) Plaintiff's proposed construction is over-broad and would encompass many of the other enumerated transmissions as well, including (for example) a beeper or pager message, a fax message, a voice mail message, or an answering service message.

   j. **"Limitation" and "restriction:"**[14] "A restraining, confining, or bounding rule or condition." As the court finds plaintiff's construction to be overly broad

---

[13] Claim 34.

[14] Claims 30, 102, 122.

and defendant's construction to be too limiting, the court construes these limitations consistent with the parties' stipulation for these terms submitted in Sleepy Hollow. (See D.I. 74, ex. AA at 2) This construction is consistent with the claim language, which indicates that a "limitation or restriction" that "contains information for prohibiting a withdrawal from a checking account or for prohibiting a cashing of a check on a checking account" can be created on a communication device, then "transmitted from a communication device associated with an individual account holder," and then stored in a memory device. (See col. 47:20-30) This construction is further supported by the specification, which indicates that "specific limitations and/or restrictions [] may be pre-selected and/or programmed by the cardholder and which may include limitations and/or restrictions on the usage of the card." (Col. 16:15-18)

The specification further describes the types of limitations or restrictions which may be set, including but not limited to: the types of transactions and the types of goods or services for which a card is used; the stores or service providers which may be authorized to accept the card; limits on the dollar amounts of transactions pertaining to each authorized vendor, seller, and/or service provider; daily spending limits; the geographical area or location within which the card may be utilized; and authorized times for card usage. (See col. 16:18-31; see also cols. 41:41-43:57)

This construction is also consistent with a purpose of the invention, directed to providing transaction security and notification to the account holder where the central processing computer determines whether "any other pre-defined, pre-selected and/or programmed limitation(s) and/or restriction(s) have been met, have been satisfied and/or have been reconciled." (See col. 18:16-21; see also col. 26:14-22) (implying

11

that any such limitations or restrictions are optional)

        **k. "Network computer:"**[15] "A term of art used throughout the computer industry in the mid-to late 1990's that referred to a computing device capable of running its operating system but reliant upon an outside network for software, data storage, and data processing." The court previously noted that the patentees included definitions during prosecution of the '003 patent nine years after the date of the original specification. So long as plaintiff asserts that the earliest priority date of the '003 patent should be August 8, 1996, the limitations must also be construed with respect to what one of skill in the art would have understood the term "network computer" to have been at the time of the patent's effective filing date – August 8, 1996.

The term as used in the specification only occurs as part of a list of communication devices among other devices such as a fax machine, personal computer, or telephone. (*See, e.g.* cols. 6:4-21, 14:58-15:18) A "network computer" as used, therefore, is distinguishable from a personal computer. Plaintiff's construction conflates the two and is not consistent with the patent's usage of the term throughout the specification. In the present situation, the extrinsic evidence informs the court as to what one of ordinary skill in the art would have considered a "network computer" to mean at the time of the invention and the above construction is consistent with that meaning. (*See* D.I. 113, ex. J, ENCYCLOPEDIA OF COMPUTERS AND COMPUTER HISTORY 570-71 (Paul Rojas ed., vol. 2 2001);[16] *see also* D.I. 106, ex. I)[17]

---

      [15]Claims 34, 414, 423.

      [16]Network computer is described as "a simple machine optimized for electronic communication" that "cannot be used without a network, as the software is not stored in

12

**l. "Processing device:"**[18] "That part of the central processing computer which processes information about transactions and accounts." The term processing device is used 141 times and is consistently used in the context of the central processing computer. In claim 30, for example:

> [A] processing device, wherein the processing device processes information regarding a banking transaction, wherein the processing device utilizes the limitation or restriction automatically stored in the memory device in processing the banking transaction, and further wherein the processing device generates a signal containing information for allowing or disallowing the banking transaction.

(Col. 47:19-43; *see also* cols. 47:50-58, 55:24-31) The processing device here is distinct from a communication device and a transaction device, such as the point-of-sale terminal.

Additionally, the court finds that the processing device is not merely the central processing unit (CPU) since it is more than just where "arithmetic and logical operations are performed and program instructions are executed," as argued by defendant. (*See* D.I. 105 at 21) Figures 2, 5, and 8 do show that the central processing computer is composed of various component devices including a CPU. (*See* Cols. 15:45-53; 23:55-64; 31:22-31) However, the specification teaches that the processing device,

---

a local hard disc." (ENCYCLOPEDIA OF COMPUTERS AND COMPUTER HISTORY 570-71 (Paul Rojas ed., vol. 2 2001)).

[17]The *Sleepy Hollow* court found these materials similarly instructive in determining the meaning of "network computer" as used in the '725 patent, which shares a specification with the '003 patent presently at issue. *See Joao v. Sleepy Hollow Bank*, Civ. No. 03-10199, 2006 WL 6164178 (S.D.N.Y. June 15, 2006).

[18]Claims 30 102, 317, 414, 415, 422.

among other functions, "utilizes" (col. 44:47), "generates" (col. 44:50), "authorizes" (col. 44:65), "disallows" (col. 44:66), and "determines" (col. 46:37) what is done with transactions and information about transactions. These various actions disclose that the processing device is more than just the CPU.

**m. "Real time:"**[19] "Immediately." This construction is consistent with the claim language describing that, once "the processing device generates a signal containing information regarding the banking transaction," "the signal is transmitted to the network computer in real-time." (Col. 83:30-35) Similarly, the use of the term "real time" in the specification supports the above construction. For example, "[t]he apparatus and method of the present invention provides for the real-time notification of financial transactions involving credit cards, charge cards, debit cards, and/or currency or 'smart' cards, which enables a cardholder to monitor, in real-time, activity involving his or her card(s) and the corresponding accounts." (Col. 20:29-34) Additionally, the specification provides that,

> [t]he apparatus and method of the present invention may provide for an immediate, as well as for a deferred, control, monitoring and/or security function, and/or response thereto, so as to provide for the immediate and/or the deferred control, activation, de-activation, programming, monitoring and/or security, etc., of any one or more [of] the herein described credit cards, charge cards, debit cards, currency or "smart" cards, banking and/or financial accounts and associated transaction cards, and/or cellular telephones and/or cellular or mobile communications devices, and/or any other suitable application in and for which the present invention may be utilized.

(Col. 39:17-28)

---

[19]Claim 414.

14

**n. "Transaction:"**[20] "An activity." While the court finds plaintiff's construction to be over broad, it declines to narrowly construe "transaction" to mean solely a "financial activity affecting an account" as proposed by defendant.

**o. "Transaction security apparatus:"**[21] The court finds "the claim body describes a structurally complete invention such that deletion of the preamble phrase [transaction security apparatus] does not affect the structure or steps of the claimed invention." See *American Medical Systems, Inc., v. Biolitec, Inc.,* 618 F.3d. 1354, 1358-59 (Fed. Cir. 2010). Although plaintiff included a definition of this term in its September 2005 amendment, "[t]o ensure that the preamble would be a separate claim limitation" (see D.I. 107 at 14), because the phrase is merely descriptive, was not added to overcome the prior art or provide another function that would transform the preamble phrase into a limitation, it is not in fact limiting and, therefore, does not require construction.

**p. "Transmit(s)" and "transmitted:"**[22] "To send signals, data, or information to another device;" and "to have sent signals, data or information to another device." The support described above for "communication device" pertains to this limitation as well.

**q. "Communication device associated with an individual account**

---

[20]Claims 30, 31, 34, 102, 106, 122, 317, 324, 331, 414, 415, 418, 419, 420.

[21]Claims 30, 102, 317, 414.

[22]Claims 30, 41, 102, 106, 317, 414, 415, 423.

15

**holder:"**[23,24] "A communication device having a pre-recognized, pre-registered, or linked relationship with an individual account holder." This construction is consistent with the specification, which indicates that "[t]he central processing computer may then also transmit respective signals and/or data to any one or more of the cardholder's designated [communication devices]." (*See* col. 6:15-21; *see also* cols. 18:23-29; 26:24-49) The specification further describes an alternate embodiment of the invention, in which the "central processing computer [] services any predefined group of cellular telephones or cellular communication devices," such as "all cellular telephone accounts for a given telecommunications company and/or area" and may "process and maintain records of cellular telephone calls, including billing information, for any number of cellular telephones, cellular telephone accounts, and/or cellular telephone owners which or who are serviced by a particular communications company or central processing office or computer." (Col. 29:25-36) The communication device may also establish a "linked" relationship with an individual account holder. (*See* col. 14:52-15:17)

    **r. "Containing information for authorizing or disallowing the transaction:"**[25] "Presenting information to allow the approval or disapproval of the transaction." This construction is consistent with the specification, which states:

> The information and/or data transmitted to the

---

[23]Claims 30, 31, 34, 41, 102, 106, 317, 414.

[24]The court notes that for the remaining disputed limitations, plaintiff did not propose constructions consistent with the context of the claim, but instead asked the court to give the limitations their plain and ordinary meaning consistent with patentees' definitions, which are over-broad and generate, rather than reduce, ambiguity.

[25]Claims 30 and 102.

16

>
> communication device includes information and/or data
> identifying the transaction and may include the name of the
> store or the service provider and the amount of the
> transaction. The information and/or data may also provide
> the time of the transaction, the location (i.e. city, town,
> village, state, country, etc.) of the transaction. The
> information and/or data may also include the phone number
> of the central processing office and/or computer servicing
> the account so that the cardholder may telephone same in
> order to authorize or cancel the transaction.

(Col. 6:22-32; see also 18:30-34; 26:31-46) This construction is also supported by the overall purpose of the invention – to allow an account holder to monitor account activity. (See, e.g., 8:11-30) The communication device may be pre-set or programmed to reply. (See col. 7:48-52)

**s. "Determines whether the banking transaction is allowed or disallowed:"**[26] "To determine whether the transaction is allowed or disallowed." This construction is consistent with the claim language, which states that the "processing device processes the second signal and determines whether the banking transaction is allowed or disallowed." (See col. 84:9-11)

**t. "Information regarding a banking transaction:"**[27] "Data describing a particular banking transaction." This is consistent with the claim language, which recites "wherein the processing device processes information regarding a banking transaction" and "generates a signal containing information for allowing or disallowing the banking transaction." (Col. 47:36-43; see also col. 84:2-5 stating that the "information regarding the banking transaction is transmitted to the communication

---

[26] Claim 415.

[27] Claims 30 and 414.

17

device on or over at least one of the Internet and the World Wide Web")

    **u. "Internet transaction:"**[28] "An activity conducted over the Internet." The term "Internet transaction" does not appear in the specification. The court, therefore, looks to the use of the term "Internet" in the specification to determine the limitation's proper meaning. The specification describes a transaction where "[t]he point-of-sale terminal may be utilized at the location of the seller and/or service provider . . . such as in cases when the sale is a telephone order, mail order and/or other type of transaction, including transactions made on, or over, the [Internet] and/or other on-line services or communication networks or mediums." (Col. 4:15-23) The specification further indicates that

> [t]he apparatus and method of the present invention may also be utilized in connection with an on-line service and/or on, or over, the Internet and/or the World Wide Web, so as to provide for a means by which the authorized user or operator may utilize the apparatus in conjunction with a home and/or a personal computer and/or a commercial or industrial computer system (i.e., an Internet server computer) and/or any other appropriate device, including a personal communication and/or computing device, in a network environment, and which may be utilized over any suitable and/or appropriate communications network or medium.

(Col. 10:3-14) In this regard, the specification describes an "Internet transaction" as a "transaction," which the court has defined as "an activity," conducted over the Internet.

    **v. "Automated teller machine account:"**[29] "An account that is accessible by using an automatic teller machine." This construction is supported by the

---

[28] Claim 324.

[29] Claims 414 and 422.

specification, which includes "automated teller machine account" in an enumerated list of different accounts. (*See, e.g.*, col. 1:38-42; 2:1-3; 60-63; 3:16-21; 24-34; 8:37-43)

**w. "[A] transmitter, wherein the transmitter transmits a second signal to the communication device or to a second communication device associated with the individual account holder, wherein the second signal contains information regarding the banking transaction:"**[30] "A transmitter found in the central processing computer, wherein . . ." Defendant argues that the unqualified term "transmitter," as used in claims 31, 41, and 106, is ambiguous and, therefore, indefinite since the transmitter could be either the transmitter found in the point-of-sale device or the transmitter found in the central processing computer. (D.I 105 at 28-30) However, given the court's construction of "processing device" as "that part of the central processing computer which processes information about transactions and accounts," the transmitter here can only be the transmitter found in the central processing computer.

**x. "[A] transmitter, wherein the transmitter transmits a periodic transaction record to the communication device or to a second communication device associated with the individual account holder, wherein the periodic transaction record shows a transaction or transactions on the checking account for a time period, wherein the periodic transaction record is transmitted to the communication device or to the second communication device at least one of**

---

[30]Claim 31.

**automatically and in response to a request for the periodic transaction record:"**[31] "A transmitter found in the central processing computer, wherein . . ." The above analysis for limitation "g" applies to this limitation as well.

**y. "[A] transmitter, wherein the transmitter transmits a second signal to the communication device or to a second communication device associated with the individual account holder, wherein the second signal contains information regarding the transaction:"**[32] "A transmitter found in the central processing computer, wherein . . ." The above analysis for limitation "g" applies to this limitation as well.[33, 34]

_____
United States District Judge

---

[31]Claim 41.

[32]Claim 106.

[33]Defendant's motion to strike the reports of Richard J. Apley and Alex Cheng (D.I. 116) is denied as moot.

[34]Given the court's constructions above, the claims of the '003 patent are more narrow than those of the '725 patent such that "the issue of invalidity common to each action is [not] substantially identical." See Westwood Chemical, Inc. v. United States, 525 F.2d 1367, 1372 (Ct. Cl. 1975) (citation omitted). For example, this court construed "communication device" (found in each asserted independent claim) to mean "a device for transmitting and receiving signals, data, or information," whereas this limitation in the '725 patent was construed as "an apparatus for the transmission of intelligence between two or more points." See Joao v. Sleepy Hollow Bank, 348 F. Supp. 2d 120, 126. Defendant's motion for summary judgment of invalidity based on collateral estoppel (D.I. 57) is, therefore, denied. Plaintiff's cross motion for summary judgment of no collateral estoppel (D.I. 69) is denied as moot.