**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JOAO BOCK TRANSACTION SYSTEMS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:12-cv-01138-SLR |
| v. | ) | |
| | ) | |
| JACK HENRY & ASSOCIATES, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

**DEFENDANT JACK HENRY & ASSOCIATES, INC.'S**
**OPENING BRIEF IN SUPPORT OF ITS MOTION**
**FOR SUMMARY JUDGMENT OF INVALIDITY**

Dated: September 29, 2014

POLSINELLI PC

Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com

OF COUNSEL:
Russell S. Jones, Jr.
Richard P. Stitt
Joshua M. McCaig
Polsinelli PC
900 W 48th Place, Suite 900
Kansas City, MO 64112-1895
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
rjones@polsinelli.com
jmccaig@polsinelli.com
rstitt@polsinelli.com

*Attorneys for Jack Henry & Associates, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

I.      INTRODUCTION .......................................................................................................... 1

II.     NATURE AND STAGE OF PROCEEDINGS .............................................................. 1

III.    SUMMARY OF ARGUMENT ..................................................................................... 1

        A.      The Asserted Claims Are Directed to Patentable Ineligible Subject Matter
                and Therefore Do Not Qualify for Being Patented Under 35 U.S.C. §101. ........... 1

        B.      The Asserted Claims Are Obvious Under 35 U.S.C. 103 in View of
                the Cited Prior Art............................................................................................... 2

        C.      All Asserted Claims Lack Enablement Under 35 U.S.C. § 112, As
                The '003 Patent Fails To Teach How the Processing Device Functions
                Are Performed...................................................................................................... 3

IV.     STATEMENT OF UNDISPUTED FACTS .................................................................. 3

V.      LEGAL STANDARD FOR SUMMARY JUDGMENT................................................ 8

VI.     ARGUMENT ................................................................................................................ 8

        A.      The Asserted Claims Are Invalid Because They Claim Only An
                Abstract Idea Comprising Mental or Manual Processes Performed By
                A General Purpose Computer. ............................................................................. 8

                1.      The Machine-or-Transformation Test For Patent-Eligible
                        Subject Matter............................................................................................ 9

                2.      The Two-Step Analysis of *Mayo* and *Alice* Applies To Both
                        Method and System or Apparatus Claims. ............................................. 10

                3.      The Asserted Claims Fail the Machine-or-Transformation Test. ............ 11

                4.      The Asserted Claims Fail the *Mayo* & *Alice* Two Step Test. ................... 12

                        a.      Step One: The Claims are Directed to a Patent-Ineligible
                                Concept; *i.e.,* An Abstract Idea..................................................... 12

                        b.      Step Two: There is Nothing Else in the Claims that Makes
                                Them Patent-Eligible. .................................................................. 13

                        c.      The '003 Patent Claims A General Purpose Computer And
                                Is Admitted To Be Using Any Widely Known Software
                                Routines. ....................................................................................... 21

48914222.3

d.    Claiming the Use of the Internet Does not Add an "Inventive Concept" to the Asserted Claims. ........................................................... 23

B.    The Asserted Claims are Invalid Based on Obviousness Under 35 U.S.C. § 103. 24

1.    Obviousness In General. .......................................................................... 24

2.    The Asserted Claims Are Invalid As Obvious Because the Only Real Distinction Plaintiff Has Made Between the Cited Prior Art and the Claim is Using the Internet as a Means of Sending Information. ............. 25

3.    The Use of the Internet in 1996 was Obvious as a Matter of Law. .......... 25

4.    A POSITA Would Have Been Motivated to Utilize the Internet for Banking Services Before August 8, 1996. ........................................... 29

5.    Conclusion – All Asserted Claims Are Obvious ...................................... 30

C.    Plaintiff's Final Infringement Contentions, Expert Reports And Deposition Testimony Show That Plaintiff Is Estopped From Re-Litigating Previously-Invalidated Claims. ............................................................. 31

D.    Asserted Claims 30, 102, 317, 414 and 422 are Invalid For Lack Of A Written Description Of The Logical Operations Performed by the Processing Device. ............................................................................. 34

1.    Raymond Joao Admitted He Lacked The Requisite Knowledge To Describe The Banking Computations Of The Processing Device. ........... 35

2.    Teaching An Algorithm Or Software Is Necessary Under The Written Description Requirement As Logical Operations Are Claimed. .............................................................................................. 36

VII.    CONCLUSION ............................................................................................. 38

48914222.3

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accentive Global Servs. GmBH v. Guideware Software, Inc.,*
    728 F.3d 1336 (Fed. Cir. 2013)................................................................13

*Alice Corp. Pty. Ltd., v. CLS Bank Int'l,*
    134 S.Ct. 2347 (2014)..................................1, 2, 9, 10, 11, 12, 13, 14, 21, 22, 23, 24

*Ariad Pharms, Inc., v. Eli Lilly and Co.,*
    598 F.3d 1336 (Fed. Cir. 2010)........................................................35, 36, 37

*Assn. for Molecular Pathology v. Myriad Genetics, Inc.,*
    133 S.Ct. 2107 (2013)........................................................................9

*Bancorp Servs. LLC. v. Sun Life Assur. Co. of Canada*
    687 F.3d 1266 (Fed. Cir. 2012)........................................................13, 14

*Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.,*
    642 F.3d 1031 (Fed. Cir. 2011)...............................................................8

*Bilski v. Kappos,*
    561 U.S. 593, 130 S.Ct. 3218 (2010)..................................................9, 11, 12, 21

*Blonder-Tongue Labs., Inc. v. Univ. of Illinois Fdn.,*
    402 U.S. 313 (1971)........................................................................32

*In re Brimonidine Patent Litig.,*
    643 F.3d 1366 (Fed. Cir. 2011)..............................................................25

*Brown v. 3M,*
    265 F.3d 1349 (Fed. Cir. 2001)...............................................................8

b*uySAFE, Inc. v. Google Inc.,*
    964 F.Supp.2d 331 (D. Del. 2013)............................................................14

*buySAFE, Inc. v. Google, Inc.,*
    No. 2013-1575, 2014 WL 4337771 (Fed. Cir. Sept. 3, 2014)..................................8

*Cyberfone Systems, LLC v. CNN Interactive Group, Inc.,*
    558 Fed. App'x 988 (Fed. Cir. 2014).........................................................8

*CyberSource Corp. v. Retail Decisions, Inc.,*
    654 F.3d 1366 (Fed. Cir. 2011).......................................................9, 10, 11, 12, 13

48914222.3

*In re Daniel S. Fulton*,
    391 F.3d 1195 (Fed. Cir. 2004)............................................................................28

*Digitech Image Techs., LLC v. Elecs. For Imaging, Inc.*,
    758 F.Supp.3d 1344 (Fed. Cir. 2014) ................................................................22

*Eclipse IP LLC v. McKinley Equip. Corp.*,
    No. CV 14-154-6W, 2014 WL 4407592 (C.D. Cal., Sept. 4, 2014)................22

*Every Penny Counts, Inc. v. Wells Fargo Bank, N.A.*,
    No. 8:11-cv-2826, 2014 WL 4540319 (M.D. Fla. Sept. 11, 2014).................22

*Fresenius USA, Inc. v. Baxter Intern., Inc.*,
    582 F.3d 1288 (Fed. Cir. 2009)............................................................................24

*Gottschalk v. Benson*,
    409 U.S. 63 (1972).................................................................................................12

*In re Gurley*,
    27 F.3d 551 (Fed. Cir. 1994)................................................................................27

*Loyalty Conversion Sys. Corp. v. American Airlines, Inc.*,
    No. 2:13-cv-00655, 2014 WL 4364848 (E.D. Tex., Sept. 3, 2014)................22

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
    132 S.Ct. 1289 (2012).................................................................................10, 12, 13

*McGinley v. Franklin Sports, Inc.*,
    262 F.3d 1339 (Fed.Cir.2001)..............................................................................28

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318, 1327 (Fed. Cir. 2008)...........................................23, 24, 25, 26, 27

*Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*,
    288 F.3d 519 (3d Cir. 2002).................................................................................32

*Nuance Communications, Inc. v. Tellme Networks, Inc.*,
    707 F. Supp.2d 472 (D. Del. 2010) ......................................................................8

*Planet Bingo, LLC v. VKGS LLC*,
    2014 WL 4195188 (Fed. Cir. 2014).....................................................................22

*Rolls-Royce, PLC v. United Technologies Corp.*,
    603 F.3d 1325 (Fed. Cir. 2010)......................................................................25, 26

*SiRF Tech., Inc. v. ITC*,
    601 F.3d 1319 (Fed. Cir. 2010).....................................................................10, 11

iv

*Soverain Software LLC v. Newegg Inc.*,
   705 F.3d 1333, 1340 (Fed. Cir. 2013), *cert. denied*, 2014 WL 102440 (2014)......................23

*Tuxis Techs., LLC v. Amazon.com, Inc.*,
   No. CV-13-1771-RGA, 2014 WL 4382446 (D. Del. Sept, 3, 2014).........................................8

*Walker Digital, LLC v. Google, Inc.*,
   No. 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014) .................................................22

**Statutes**

35 U.S.C. §101..................................................................................1, 2, 8, 9, 10, 13, 22, 23, 24

35 U.S.C. §103.............................................................1, 2, 4, 7, 8, 24, 27, 29, 30, 31, 32

35 U.S.C. §112................................................................................1, 3, 34, 35, 36, 38

**Other Authorities**

Fed. R. Civ. P. 56(a) ...............................................................................................8

Fed. R. Civ. P. 60(b) .............................................................................................32

48914222.3

## I.    INTRODUCTION

All the asserted patent claims[1] are invalid for any of three separate reasons: (1) they are directed to patent ineligible subject matter, under *Alice Corp. Pty. Ltd., v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014) and related cases; (2) they are invalid as being obvious under 35 U.S.C. §103; and (3) they are invalid for lack of enablement under 35 U.S.C. §112 based on lack of written description and indefiniteness.  This Court should enter summary judgment in favor of Jack Henry based on invalidity of the asserted claims.

## II.    NATURE AND STAGE OF PROCEEDINGS

Plaintiff brought this action in September 2012, alleging that Jack Henry infringed U.S. Patent No. 7,096,003. (D.I. 1). Jack Henry answered and counterclaimed. (D.I. 6). Fact discovery closed in May, 2014. The Court held a *Markman* hearing and entered a claim construction hearing on June 30, 2014 (D.I. 124). Final infringement and invalidity contentions have been served.  Expert discovery is essentially completed.[2]  A status conference was held on September 24, 2014.  A jury trial is set for January 5, 2015.  *Id.*

## III.    SUMMARY OF ARGUMENT

### A.    The Asserted Claims Are Directed to Patentable Ineligible Subject Matter and Therefore Do Not Qualify for Being Patented Under 35 U.S.C. §101.

The asserted claims of the '003 Patent cover nothing more than the unpatentable abstract idea of observing whether a bank transaction (*e.g.*, a check) meets an account rule or limit and, in

---

[1] There are presently four (4) independent claims-in-suit: claims 30, 102, 317 and 414. There are also eight (8) dependent claims asserted: claims 31, 34, 106, 122, 324, 343, 416, and 422. (Stitt Decl., Ex. 17 and D.I. 1).

[2] Each party has indicated a desire to take short supplemental depositions of the other's experts based on documents just provided or source code that JBTS's expert did not have time to review when it was first made available.  We expect those depositions to be completed by mid-October, and do not expect them to affect this motion.

some claims, contacting the account owner about it. This abstract idea includes no more than mental or manual human activity performed on a generic or general purpose computer, claimed as off-the-shelf component parts. The claims omit any explanation as to how the computer would be programmed; indeed, the inventors admit that the software needed to carry out the claimed operations would be "any of the widely known data processing and/or software routines, which are known to those skilled in the art."[3] Since the assert claims are directed to a generic computer configured to implement subject matter that is patent ineligible under 35 U.S.C. §101, the asserted claims are invalid as a matter of law. *See Alice Corp.*, 134 S.Ct. at 2360.

**B.      The Asserted Claims Are Obvious Under 35 U.S.C. 103 in View of the Cited Prior Art.**

The cited prior art discloses virtually every structure and function in the asserted claims: memory devices, transmitters, receivers, processing devices and communication devices. The only difference between the asserted claims and the cited prior art is that the asserted claims use the Internet, instead of telephone or pre-Internet communication protocols, to send communications. But the undisputed evidence and case law establish that moving functions from older means of electronic communications to the Internet was obvious as a matter of law in 1996. In view of this obvious combination, all asserted claims are invalid under 35 U.S.C. § 103.

In addition, collateral estoppel applies to invalidate the asserted claims because the claim terms used in those claims are virtually identical to those used in claims 108 and 267 of the '725 patent, which were invalidated in the *Sleepy Hollow* judgment.

---

[3] '003 Patent, Col. 25:17-22.

### C. All Asserted Claims Lack Enablement Under 35 U.S.C. § 112, As The '003 Patent Fails To Teach How the Processing Device Functions Are Performed.

Each asserted claim recites a "processing device" that "processes information regarding a banking transaction" or a variation of this limitation. But the '003 patent teaches only use of off-the-shelf software running on a general purpose computer to perform the claimed functions. The inventors cited to passages of the specification as providing an algorithm or "exemplary embodiments of processing banking account information," but nothing in these passages, nor in fact anything in the entire specification, reveals any algorithm, software or description of these processing functions sufficient to inform a person of ordinary skill in the art how to perform these claim limitations. Therefore all asserted claims fail to meet the requirements of 35 U.S.C. §112.

## IV. STATEMENT OF UNDISPUTED FACTS

In 2003, JBTS accused a Jack Henry customer – Sleepy Hollow Bank of Sleepy Hollow, New York – of infringing the U.S. Pat. No. 6,529,725. Jack Henry defended the *Sleepy Hollow* case on behalf of its customer, and JBTS added Jack Henry as a defendant. JBTS accused Jack Henry of infringing claims 108, 109, 267, 280, 293, and 294 of the '725 Patent.[4] After a trial in 2010, the district court entered a judgment that all of those claims were invalid under §§102 and 103 based on the Fulton patent, No. 6,182,052 (including its embodiment by Huntington Bank), Jack Henry's pre-1996 Cash Management product, and other references. (Stitt Decl., Exs. 14 and 15).

At the same time, the inventors were prosecuting a continuation patent based on the '725. That patent issued as the '003 patent in August, 2006. (Stitt Dec'l., Ex. 7). Being a continuation

---

[4] Claims 108 and 267 were independent claims; the others depended on either claim 108 or claim 267.

of the '725 patent, the '003 specification is identical to the '725 specification. (Stitt Dec'l., Ex. 7 and 9).

In the '003 patent, Claim 30 includes what JBTS's expert calls "key structures:" a memory device that stores a limitation or restriction containing information for prohibiting a check from being cashed; the limitation or restriction being sent from a communication device associated with an individual account holder over the Internet or World Wide Web; and a processing device that uses the limitation or restriction in processing the banking transaction and generates a signal containing information for approving or disapproving the transaction.

The "key structures" for claim 102 are essentially the same as those in claim 30, except the account is being used to purchase goods or services and the processing device processes an "authorization request."

Claim 317 adds an "input" or "data entry" device and a transmitter that transmits the signal generated by the processing device to a communication device "independently of any processing of the transaction by a central transaction processing computer."

Claim 414 claims the processing device (but no limitation or restriction) and adds a transmitter that transmits a signal containing information about a banking transaction to a "network computer" in "real time," as well as having information sent to one of a set of listed communication devices.

Defendant provided expert reports of Dr. Steven Kursh and Mr. John Fulton regarding invalidity of the '003 patent.[5] Dr. Kursh opined that the asserted claims were invalid as obvious under 35 U.S.C. §103 in light of a pre-1996 Jack Henry product named Cash Management[6] and

---

[5] *See*, Kursh Report, Stitt Decl., Ex. 1; Fulton Report, Stitt Decl., Ex. 18.

[6] This is not the "Net Teller Cash Management" product that plaintiff accuses of infringing the asserted claims. That product is part of the Net Teller suite of online banking

several Internet banking publications. Mr. Fulton opined that the '003 claims were invalid as obvious in light of his '052 patent and its embodiment as Huntington Bank's Smart Phone product offered before 1996, and the Internet banking publications.

Mr. Fulton provided an element-by-element analysis of each claim and explained how his '052 patent and the Huntington Bank/AT&T SmartPhone 2100 offered before 1995 covered virtually every element of the asserted claims. The Fulton materials disclosed a pre-programmed telephone with a touch-screen that would allow a Huntington Bank customer to communicate directly with the computer in the bank to perform a number of banking and other transactions. These transactions included putting in stop payment orders, paying bills, and buying groceries, tickets and other items. (*See* Stitt Decl., Ex. 8, '052 patent, Figs. 1-15 and Cols. 1:55-2:63). The SmartPhone and the bank's host computer had all the structural features of the '003 claims: memory device, processing device, communication device, receiver and transmitter; and performed almost all the functions claimed in the '003 claims.

Dr. Kursh also provided an element by element analysis of each limitation for each asserted claim and showed that Jack Henry's pre-1996 Cash Management was in use by others well before the priority date of the '003 Patent. Cash Management was a product that allowed a bank's business customers to perform banking transactions using a personal computer connected to a bank's host computer using a modem-to-modem phone line. Like the Fulton system, Cash Management had all the physical structures recited in the '003 claims and performed virtually all of the claimed functions.

The only things in the asserted claims missing from Cash Management and Fulton were using the Internet for transmission and using a wireless device as required by dependent claims

products developed by Jack Henry in 1998 and thereafter. References herein to "Cash Management" will be to the old pre-1996 product unless otherwise stated.

343 and 416. Dr. Kursh opined that use of the Internet and wireless devices would have been obvious to a person of ordinary skill in the art ("POSITA") before the priority date, and cited to numerous publications he entitled "Internet Banking Publications," which are articles describing various financial institutions allowing customers to conduct banking transactions over the Internet published before August 8, 1996.[7]

One such publication cited by Dr. Kursh was a June 21, 1995 BUSINESS WIRE article entitled "Stanford Federal Credit Union Pioneers Online Financial Services." The article explained how Stanford Federal Credit Union ("SFCU") in California was pioneering online banking over the Internet in the early 1990's.[8] One of the SFCU employees quoted in the article was Sam Tuohey, then vice-president for marketing.[9]

Mr. Tuohey was deposed in this case. He corroborated the substance of the BUSINESS WIRE article. He testified that in 1993, SFCU began allowing customers to perform Internet banking transactions including fund transfers, withdrawing funds with a check and observing transactional history.[10] Particularly, he described withdrawing funds with a check as follows:

> Q.    Okay. Explain to me what you mean by withdrawing funds with a check. How would that have worked with the internet at that time?
>
> A.    You would log on, you would indicate which account you wished to access, and then you would type in the amount of the dollars and cents you would

---

[7] *See*, Kursh Report, Stitt Decl., Ex. 1, pgs. 62-63 and App. J to his report; The articles referenced by Kursh as Internet Banking Publications are included as Ex. 6 to the Stitt Declaration. These include articles published in NETWORK WORLD, BUSINESS WIRE and COMPUTER WORLD describing Internet banking offerings from Stanford Federal Credit Union, Security First Network Bank, Wells Fargo, First Union, Capital One Financial and Bank of America.

[8] *See*, Stitt Decl. Ex. 2, JHA-DE-00070049-000001.

[9] *Id.*

[10] Stitt Decl., Ex. 3, Tuohey deposition, 23:19 – 24:3.

like to see on the check, and the check would be confirmed by the user and then a check would be printed by the financial institution, Stanford, and then mailed to the person at their address of record on our system.[11]

Mr. Tuohey further testified that by 1994, SFCU customers could log into their accounts via the World Wide Web to make loan payments over the Internet.[12] Based on the combination of the Cash Management system and the Internet Banking Publications, Dr. Kursh opined that all of the Asserted Claims were invalid as obvious under 35 U.S.C. § 103.

JBTS's expert, Alex Cheng, of course disagreed with Dr. Kursh's opinion that Jack Henry's Cash Management in combination with the Internet Banking Publications rendered the asserted claims obvious. But summary judgment is nonetheless appropriate because Mr. Cheng seriously challenged only Dr. Kursh's opinion that a POSITA would have been motivated to utilize the Internet for banking functions on or before August 8, 1996.[13] He did not dispute that Cash Management met the other limitations, nor that using a wireless device would have been obvious to a POSITA in 1996.[14]

The uncontroverted evidence and the case law compels the conclusion that using the Internet to send and receive signals regarding banking transactions was obvious in 1996. Therefore, the Court can and should hold that Mr. Cheng's opinion does not create a genuine issue of material fact that would prevent summary judgment on obviousness.

---

[11] Stitt Decl., Ex. 3, Tuohey deposition, 24:18 – 25:3.

[12] Stitt Decl., Ex.3, Tuohey deposition, 29:19 – 31:21.

[13] Stitt Decl., Ex. 4, Cheng Validity Report, pgs. 172-174 ¶¶ 373 – 377.

[14] *Id.*

# V.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Invalidity can be determined at the summary judgment stage. *See, e.g., Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001); *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.,* 642 F.3d 1031, 1038–39 (Fed. Cir. 2011). "The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Section 101 patent eligibility is a question of law that is properly determined on a motion for summary judgment. *See Cyberfone Systems, LLC v. CNN Interactive Group, Inc.,* 558 Fed. App'x 988, 991 (Fed. Cir. 2014).[15]

Obviousness "is a question of law, which depends on several underlying factual inquiries." *Nuance Communications, Inc. v. Tellme Networks, Inc.,* 707 F. Supp.2d 472, 492 (D. Del. 2010). Summary judgment may be granted on obviousness where the party asserting the defense shows by clear and convincing evidence that "the differences between the matter sought to be patented and the prior art are such they the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. §103(a) (quoted in *Nuance Communications*, 707 F.Supp.2d at 492).

# VI.    ARGUMENT

   A.    **The Asserted Claims Are Invalid Because They Claim Only An Abstract Idea Comprising Mental or Manual Processes Performed By A General Purpose Computer.**

Section 101 of the Patent Act defines patentable subject matter. It states:

---

[15] Indeed, Courts have invalidated claims under § 101 in the context of Rule 12(c) motions for judgment on the pleadings. *See, e.g., buySAFE, Inc. v. Google, Inc.*, No. 2013-1575, 2014 WL 4337771, at *5 (Fed. Cir. Sept. 3, 2014); *Tuxis Techs., LLC v. Amazon.com, Inc.*, No. CV-13-1771-RGA, 2014 WL 4382446 (D. Del. Sept, 3, 2014).

48914222.3

Whoever invents or discovers any new and useful process, machine, manufacturer, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

Excluded from patent protection by §101 are a law of nature, natural phenomena, and an abstract idea. *Assn. for Molecular Pathology v. Myriad Genetics, Inc.,* 133 S.Ct. 2107, 2116 (2013). Patents that merely claim well-established, fundamental concepts fall within the category of abstract ideas. *Bilski v. Kappos*, 561 U.S. 593, 130 S.Ct. 3218, 3231 (2010) (hedging is a fundamental economic practice long present in our system of commerce and taught in any introductory finance class). *See also CyberSource Corp. v. Retail Decisions, Inc*., 654 F.3d 1366, 1370-71 (Fed. Cir. 2011) (claim for verifying the validity of a credit card transaction over the Internet was drawn to unpatentable mental process); *Alice Corp.*, 134 S.Ct. at 2358 (*citing Mayo Collaborative Services v. Prometheus Laboratories, Inc.,* 132 S.Ct. 1289, 1294 (2012) (where a patent's reciting of a computer is a mere instruction to implement an abstract idea on a computer, patent eligibility is not imparted).

      1.      **The Machine-or-Transformation Test For Patent-Eligible Subject Matter.**

Under the machine-or-transformation test (MOTT), a process claim is patent-eligible if "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.*" Bilski v. Kappos,* 561 U.S. 593, 130 S.Ct. 3218, 3224 (2010). The claims in the '003 patent are styled as apparatus claims, but they merely invoke a generic computer to execute well-known processes related to banking transactions, such as negotiating a check or transferring funds. So, the MOTT analysis is instructive on the question of the patent-eligible content of these claims.

Under the MOTT, the machine involved must "impose meaningful limits on the claim's scope." *CyberSource Corp*., 654 F.3d at 1375. A machine will only "impose meaningful limit[s]

on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.*" *SiRF Tech., Inc. v. ITC,* 601 F.3d 1319, 1333 (Fed. Cir. 2010). A computer is not a significant part of the process if that process can be performed without a computer. *CyberSource*, 654 F.3d at 1375 ("[M]erely claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer does not satisfy the machine prong of the machine-or-transformation test").

> ### 2. The Two-Step Analysis of *Mayo* and *Alice* Applies To Both Method and System or Apparatus Claims.

The two-step "abstract idea" analysis was set forth in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.* and followed in A*lice Corp.,* which invalidated both method and system (apparatus) claims of a patent "drawn to an abstract idea" of "intermediated settlement."

In *Alice Corp.*, the Court stated that the first step is to "determine whether the claims at issue are directed to one of those patent–ineligible concepts" listed in §101. *Alice Corp.*, 134 S.Ct. at 2355. Second, if patent–ineligible concepts are present, "we then ask, 'what else is there in the claims…?' " "To answer that question, we consider the elements of each claim, both individually and 'as an ordered combination' to determine whether the additional elements "transform the nature of the claim" into patent-eligible application." *Id.*

The *Alice Corp.* Court first identified the claimed concept to be "a fundamental economic practice long prevalent in our system of commerce," an "'abstract idea' beyond the scope of §101." *Alice Corp.*, 134 S.Ct. at 2356. Finding an "abstract idea," the Court then analyzed the claim "as an ordered combination" and found that the steps of the method "add nothing that is not already present when the steps are considered separately." The Court found that the *system*

(in other words, device or apparatus) claims "fail for substantially the same reasons" because the "system claims recite a handful of generic computer components configured to implement the same idea." *Alice Corp.*, 134 S.Ct. at 2360. Accordingly, neither the method claims nor the system claims were patentable.

### 3. The Asserted Claims Fail the Machine-or-Transformation Test.

Under the MOTT, a process claim is patent-eligible if: "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Bilski v. Kappos,* 130 S.Ct. at 3224. If neither are present, the claim is not patent-eligible.

The asserted claims are stated as apparatus claims, but the only apparatus is a generic computer claimed as component parts, *i.e.*, memory device, receiver, transmitter, processing device. The asserted claims use a generic computer to review banking transactions and apply pre-established rules. These claims do not meet either prong of the MOTT. They are neither (1) tied to a particular machine or apparatus, nor do they (2) "transform a particular article into a different state or thing*." Id*.

The claimed generic computer in the '003 claims does not "impose meaningful limits on the claim's scope." The claimed generic computer merely performs sorting or filtering functions and applies rules to permit a solution to be achieved more quickly. *See*, e.g., *SiRF Tech., Inc. v. ITC,* 601 F.3d at 1333 (using a computer simply to perform calculations does not impose a meaningful limit on the scope of a claim, it is merely an obvious mechanism for achieving a solution more quickly). These processes can be performed without a computer and do not satisfy the machine prong of the MOTT. *See CyberSource Corp.*, 654 F.3d at 1375 ("merely claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer does not satisfy the machine prong of the machine-or transformation test"). Therefore the asserted claims fail the first prong of the MOTT.

As to the second prong, no transformation of "a particular article into a different state or thing" occurs. *Bilski*, 130 S.Ct. at 3224. "Transformation and reduction of an article 'to a different state or thing' is the clue to the patentability of a process claim that does not include particular machines." *Gottschalk v. Benson,* 409 U.S. 63, 70 (1972). Since "[p]urely mental processes in which thoughts or human based actions are "changed" are not considered an eligible transformation. And, "[f]or data, mere "manipulation of basic mathematical constructs [i.e,] the paradigmatic 'abstract idea'," has not been deemed a transformation, the asserted claims fail the second prong of the MOTT. *See Cybersource v. Retail Decisions*, 654 F.3d at 1372 n.2.

### 4. The Asserted Claims Fail the *Mayo & Alice* Two Step Test.

#### a. Step One: The Claims are Directed to a Patent-Ineligible Concept; *i.e.,* An Abstract Idea.

The first step is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice Corp.*, 134 S.Ct. at 2355. The '003 patent claims are directed to an "abstract idea," which is a banking practice known and used for many years:

> Comparing a bank transaction (a check) to account rules or limits (claims 30, 102, and 122),

and then,

> Advising the account owner of the action or requesting approval (claims 31, 24, 106, 317, 324,343,414, 416 and 422).

Prior art patents treat these activities as commonplace and long-known bank procedures. In Lawlor, U.S. Patent No. 5, 220,501 (filed December 8, 1989) the inventor recites bank rules analysis and applies it in the form of stop payment orders (Col. 35:36-41), PIN analysis (Col. 20:27-36), determinations of sufficient funds (Col. 21:30-40) and rules for making pre-authorized payments (Col. 34:29-45). In Fulton, U.S. Patent No. 6,182,052 (filed June 6, 1994) placing and using stop payment orders is recited as a standard bank practice (Col. 7:51-end).

48914222.3

The '003 claims merely perform the standard banking procedure of applying a rule or limit as bank transactions are reviewed. This is not patent-eligible subject matter; it is an abstract idea performed on a generic computer. *See Cybersource,* 654 F.3d at 1373 ("[A] method that can be performed by human thought alone is merely an abstract idea and is not patent-eligible under § 101"). Merely claiming "a computer to accelerate an ineligible mental process does not make that process patent-eligible." *Bancorp Servs. LLC. v. Sun Life Assur. Co. of Canada* 687 F.3d 1266, 1279 (Fed. Cir. 2012); *Accentive Global Servs. GmBH v. Guideware Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("simply implementing an abstract concept on a computer, without meaningful limitation to that concept, does not transform a patent-ineligible claim into a patent-eligible one").

### b. Step Two: There is Nothing Else in the Claims that Makes Them Patent-Eligible.

In the second step, "we then ask, 'what else is there in the claims…?' " "To answer that question, we consider the elements of each claim, both individually and 'as an ordered combination' to determine whether the additional elements "transform the nature of the claim" into patent-eligible application." *Alice Corp.*, 134 S.Ct. at 2355. This step is "a search for 'an inventive concept.'" *Id.* This transforming "inventive concept" requires "more than simply stating the abstract idea while adding the words 'apply it' in the form of a patent claim." *Id.* "The introduction of a computer into the claims does not alter the analysis at *Mayo* step two." *Alice Corp.*, 134 S.Ct. at 2357. "[R]ecitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 2358.

All asserted claims recite a generic or general purpose computer as component parts, *i.e.*, a processing device, a memory device, a receiver, a transmitter. These computer parts perform the covered tasks exactly as a person would perform them, but (at least in theory) faster. This

13

does not confer patent eligibility. *Bancorp Servs.*, 687 F3d at 1279 ("using a computer to accelerate an ineligible mental process does not make that process patent-eligible"); b*uySAFE, Inc. v. Google Inc.,* 964 F.Supp.2d 331, 336 (D. Del. 2013) (using a computer to perform more efficiently what could otherwise be accomplished manually does not confer patent-eligibility).

Financial institutions have done the tasks performed by the claimed generic computer for years. Again, the tasks are merely comparing a banking transaction (*e.g.*, a presented check) against account rules or limits (claims 30, 102, and 122) and contacting the account owner for verification of the transaction (claims 31, 34, 106, 317, 324, 343, 414, 416 and 422). These are mental and manual tasks. All the asserted claims add is using a generic computer to more efficiently perform these manual and mental banking processes.

This is shown by comparing each claim limitation to the following hypothetical example:

> Mr. Ashley, a bank teller, is sorting the checks presented that day for payment. An account holder, Ms. Samuels, asks (or has asked) Mr. Ashley to stop payment on her check No. 235 for $75.00. Mr. Ashley locates check 235 for $75.00 and does not pay it.

In the comparison tables, *infra*, the column labeled "Performance Without a Computer" details Mr. Ashley's activities as he performs the claimed activities. Every limitation claimed is something a person did before, using manual or mental effort. The asserted claims only instruct that a generic or general purpose computer be used to perform these tasks, instead of Mr. Ashley. This does not create a patentable invention. *See Alice Corp.,* 134 S.Ct. at 2360.

In claims 30, 31 34 and 102, 106, and 122, the hypothetical Mr. Ashley sorts checks to apply customers' stop payment orders. Claim 30 performs these same activities with a computer,

but no "inventive concept" is added. Mr. Ashley's mental or manual acts comprise every activity performed by the computer of these asserted claims:[16]

| '003 Claim Language<br>(all parentheticals are added to claim) | Performance Without a Computer |
|---|---|
| **Claim 30** | |
| 30. A transaction security apparatus, comprising: | |
| a memory device *(computer memory),* wherein the memory device stores | Mr. Ashley's memory or the bank's written list used for reference regarding holds or stop payment orders. |
| a limitation or restriction regarding a banking transaction, wherein the banking transaction involves a withdrawal from a checking account or a cashing of a check on a checking account, wherein the limitation or restriction contains information for prohibiting a withdrawal from a checking account or for prohibiting a cashing of a check on a checking account, | Mr. Ashley has memorized, or recalls to review, the written list of accounts having a hold or stop payment orders on checking accounts |
| wherein the limitation or restriction is transmitted from a communication device *(e.g., a personal computer)* associated with an individual account holder, and further wherein the limitation or restriction is transmitted to a receiver *(computer communications controller)* on or over at least one of the Internet and the World Wide Web, | An account holder, Ms. Samuels, speaks to Mr. Ashley, or she gives him a note, or calls him, and asks that Mr. Ashley stop payment on Check No. 235 for $75.00 or that he put a hold order on her account. |
| wherein the limitation or restriction is automatically received by the receiver, and further wherein the limitation or restriction is automatically stored in the memory device; | Mr. Ashley hears Ms. Samuels request or he reads her note and he memorizes it or writes it onto the bank list of stop payment orders or account hold orders |
| and a processing device, *(computer CPU)* wherein the processing device processes information regarding a banking transaction, | Mr. Ashley as he sorts that day's presented checks for cashing. |
| wherein the processing device utilizes the limitation or restriction automatically stored in the memory device in processing the banking transaction, and further | Mr. Ashley consults the list or remembers Ms. Samuels' stop payment order or hold order while sorting the presented checks for payment. |

---

[16] Charts for the independent claims appear herein; charts for the dependent claims appear in the attached Stitt Decl., Ex. 16.

48914222.3

| wherein the processing device generates a signal containing information for allowing or disallowing the banking transaction. | Mr. Ashley notices a check on Ms. Samuels' account that matches the stop payment order of Ms. Samuels and Mr. Ashley' decides he is not to pay the check. |

Claim 102 is nearly identical in scope to Claim.  In claim 102, a rule or limitation or restriction is received, stored and applied to a transaction by the recited generic computer processing device, and a result is generated.

| Claim 102<br><br>*(all parentheticals are added to claim*) | Performance Without a Computer |
|---|---|
| 102. A transaction security apparatus, comprising: | |
| a memory device, *(computer memory)* wherein the memory device stores | Mr. Ashley's memory or the bank's written list used for reference regarding holds or stop payment orders. |
| a limitation or restriction on a use of an account, wherein the account is capable of being utilized in transactions involving the purchase of goods and services, | Mr. Ashley has memorized, or recalls to review, the written list of accounts having a hold or stop payment order. |
| wherein the limitation or restriction is transmitted from a communication device *(e.g., personal computer)* associated with an individual account holder, and further wherein the limitation or restriction is transmitted to a receiver on or over at least one of the Internet and the World Wide Web, | An account holder Ms. Samuels, speaks to Mr. Ashley, or she gives him a note, and asks that Mr. Ashley stop payment on check No. 235 for $75.00 or that he put a hold order on her account. |
| wherein the limitation or restriction is automatically received by the receiver, and further wherein the limitation or restriction is automatically stored in the memory device; and | Mr. Ashley hears Ms. Samuels request or he reads her note and he memorizes it or writes it onto the bank list of stop payment orders or account hold orders |
| a processing device, *(computer)* | Mr. Ashley as he sorts checks and recalls and applies stop payments of holds |

| wherein the processing device processes an authorization request for a transaction on the account, wherein the processing device utilizes the limitation or restriction automatically stored in the memory device in processing the authorization request, and | Mr. Ashley notices a check on Ms. Samuels' account that matches the stop payment order of Ms. Samuels |
|---|---|
| further wherein the processing device generates a signal containing information for authorizing or disallowing the transaction. | Mr. Ashley' determines that he is not to approve payment of the check Ms. Samuels identified. |

Claim 317 is even more broad than claims 30, 102 and 414. In Claim 317, the apparatus comprises only a data input or data entry device, a processing device and a transmitter. In claim 317, the "processing device" merely processes transaction data. Then a transmitter (*e.g.*, the computer communications card) sends a message to the account holder, who receives and views it through a communication device, *e.g.*, a personal computer, a cell phone or a personal digital assistant.

| Claim 317<br>*(all parentheticals are added to claim)* | Performance Without a Computer |
|---|---|
| 317. A transaction security apparatus, comprising: | |
| at least one of an input device and a data entry device, *(computer keyboard)* wherein the at least one of an input device and a data entry device at least one of inputs and enters transaction information regarding a transaction into the apparatus; | Mr. Ashley eyes read the checks as he sorts them and he reads the bank's list of holds and stop payment orders and he hears Ms. Samuels' request to stop a check. |
| a processing device, *(computer CPU)* wherein the processing device processes the transaction information and generates a signal corresponding to the transaction; and | Mr. Ashley's mind as he reviews the presented checks and searches for those that appear on the stop payment or hold list and decides not to pay those checks. |

| | |
|---|---|
| a transmitter, *(computer communications controller)* wherein the transmitter transmits the signal from the apparatus to a communication device *(e.g., personal computer)* on or over at least one of the Internet and the World Wide Web independently of any processing of the transaction by a central transaction processing computer, wherein the communication device is associated with an individual account holder, and further wherein the communication device provides information to the individual account holder regarding the transaction, wherein the communication *device (e.g., personal computer)* is at least one of a beeper, a pager, a telephone, a two-way pager, a reply pager, a home computer, a personal computer, a personal communication device, a personal communication services device, a television, an interactive television, a digital television, a personal digital assistant, a display telephone, a video telephone, a watch, a cellular telephone, a wireless telephone, a mobile telephone, a display cellular telephone, and a facsimile machine. | Mr. Ashley calls or encounters Ms. Samuels. He speaks to her and tells her he found the check and stopped payment of it. |

Claims 414, 416 and 422 do not contain patentable subject matter either. In claim 414, the apparatus comprises three generic computer parts: a processing device, an input device or receiver, and a transmitter.[17] These computer parts receive transaction data, process that data and transmit a message based on the processing device's output to two other computers of the account holder. Claim 414 also recites a "network computer," which JBTS asserts is a generic router.[18]

---

[17] Stitt Decl., Ex. 19, Cheng Infringement Report, pgs. 76-77.

[18] While the "network computer" in Claim 414 is separated from its usual recitation as part of the group of "individual account holder communications devices," it must continue to be the same device associated with an account holder in other claims and the specification. The term "network computer" appears in the specification 22 times, always as one of a list of user-facing devices used to communicate and display information to the account holder or user. *E.g.*, "[T]he communication device 4 is a wireless device. In this regard, the communication device 4 or

| Claim 414<br><br>*(all parentheticals are added to claim)* | **Performance Without a Computer** |
|---|---|
| 414. A transaction security apparatus, comprising: | |
| a processing device, *(computer)* | Mr. Ashley's mind |
| wherein the processing device processes information regarding a banking transaction, wherein the banking transaction involves at least one of a checking account, a savings account, and an automated teller machine account, | Mr. Ashley's thinking as he sorts checks and recalls and applies stop payments or hold notices. |
| wherein the information is input via an input device or automatically received by a receiver, *(computer keyboard or communications controller)* | Mr. Ashley eyes read the checks notices a check on Ms. Samuels' account that matches the stop payment order of Ms. Samuels. |
| wherein the processing device is capable of allowing or disallowing the banking transaction, and | Mr. Ashley is capable and has bank authority to apply a stop payment order to allow or disallow the transaction |
| further wherein the processing device generates a signal containing information regarding the banking transaction; and | Mr. Ashley' mind considers the checks and the stop payment orders and he determines the he will not approve payment of the check. |

pager may be carried by the cardholder and/or be kept on and/or close to the cardholder's person so that the central processing computer 3 may transmit signals and/or data to the communication device 4 so as to communicate with the cardholder at any time. The communication device 4 may also comprise any one or more of a facsimile (fax) machine, a personal computer, a telephone, a telephone answering machine, an alternate telephone, an alternate telephone answering machine, *a network computer*, and/or an alternate beeper or pager. The central processing computer 3 may be linked with each of the above devices via any suitable communication system." (Stitt Decl., Ex. 7, at Col. 14: 52-65) *(italics added)*.

| Claim 414<br><br>*(all parentheticals are added to claim)* | Performance Without a Computer |
|---|---|
| a transmitter, *(computer)*<br>wherein the transmitter transmits the signal to a network computer, wherein the signal is transmitted to the network computer *(e.g., Oracle network computer)*in real-time, and further wherein the information regarding the banking transaction is transmitted to a communication device *(e.g., personal computer)*associated with an individual account holder, wherein the communication device is at least one of a beeper, a pager, a telephone, a two-way pager, a reply pager, a home computer, a personal computer, a personal communication device, a personal communication services device, a television, an interactive television, a digital television, a personal digital assistant, a display telephone, a video telephone, a watch, a cellular telephone, a wireless telephone, a mobile telephone, a display cellular telephone, and a facsimile machine, and | Mr. Ashley encounters or calls Ms. Samuels.  He speaks to her, in real-time, and tells her he found the check and is stopping payment of it. |
| further wherein the information regarding the banking transaction is transmitted to the communication device on or over at least one of the Internet and the World Wide Web. | Switching phone the telephone lines to the Internet does not confer patentable novelty |

These comparison charts make clear that all of the activities performed by the claimed generic computer parts are the same as Mr. Ashley's mental and manual acts.

These examples prove that what JBTS claims is nothing more than what bank employees have been doing for many years.  And plaintiff's expert Alex Cheng himself proved that comparing a bank transaction or a presented check to account rules or limits (such as stop payment orders or account holds is a simple human mental or manual activity.  Mr. Cheng admitted that he could perform the following sorting (or, in his words, "filtering") activities on a bag of checks: sort the checks by routing number and account number, find all the checks for more than $250, identify checks associated with a specific account and written for more than

$250, find the check written to Bob's Grocery Store, and add up the checks dated a particular dates. Stitt Decl., Ex. 10, excerpts from Cheng deposition 09/17/14.

These are the same sorting activities performed by the asserted claims. The claims use a "memory device" to store instructions, a "receiver" to receive those instructions, and a "processing device" to carry out the instructions, and a "transmitter" to tell the account holder what has occurred. Mr. Ashley (or Mr. Cheng) can do all these things. Like the "intermediated settlement" claimed in *Alice* and the "hedging risk" claimed in *Bilski,* the concepts claimed in the asserted claims are "basic concept[s]" and "fundamental economic practice[s] long prevalent in our system of commerce." They are, therefore, abstract ideas. *Alice Corp.*, 134 S.Ct. at 2356.

### c. The '003 Patent Claims A General Purpose Computer And Is Admitted To Be Using Any Widely Known Software Routines.

The court in *Alice Corp.* found "the relevant question is whether the claims here do more than simply instruct the practitioner to implement the abstract idea . . . on a generic computer." *Alice Corp.* at 2359. The asserted '003 claims do nothing more than this. Like the computer in *Alice Corp.*, the computer in the asserted claims is "a handful of generic components" that are fundamental to every computer. *See Alice Corp.*, *id.* at 2360 ("nearly every computer will include a 'communications controller' and 'data storage unit' capable of performing… basic calculations, storage and transmission functions…)." Therefore none of the hardware recited by the asserted claims (memory, receiver transmitter, processing device input device) offers a meaningful limitation beyond use of a generic or general purpose computer. *Id.*.

Nor does the specification in the '003 patent provide a software program or algorithm sufficient to teach how the "processing device" performs its claimed processing of the claimed transaction against the "limitations or restrictions." Mr. Joao, at his deposition, cited to several figures (Figs. 4, 6a, 6b, and 6c) and Columns 22 – 28 of the '003 patent specification as teaching

21

an algorithm and a description of the processing device programing. But a reading of these passages shows that nothing is taught therein that would change the claimed generic computer parts into a special purpose computer. (Stitt Decl., Exs. 11, 17).

Mr. Joao also cited to figures and portions of the specification as teaching the processor's computing operations.[19] But the identified figures offer no more than general descriptions. Nothing in the cited specification or these cited figures describes a "meaningful limitation beyond use of a general purpose computer." *Alice Corp.*, 134 S.Ct. at 2360. And, in any event, what matters is that the *claims* do not contain any such algorithm or explanation.

In an analogous case, *Planet Bingo*, the patent holder argued that its patents recited "significantly more" than an abstract idea because the invention included "complex computer code with three distinct subparts." But the Federal Circuit rejected this argument, observing that "[t]he [patents] *do not claim* the accounting program, ticket program, and verification program that Planet Bingo identifies in its briefs. Instead, the claims recite a program that is used for the generic functions of storing, retrieving, and verifying a chosen set of [data]." *Planet Bingo, LLC v. VKGS LLC*, 2014 WL 4195188 (Fed. Cir. 2014) (*italics added*).[20]

---

[19] Mr. Joao identified Figures 6a (steps 133 and 134), 6b, and 6c, and Col. 23:38; Col. 25:12 to 67 and Col. 24:50 to Col. 28:44 as showing an algorithm or an algorithm in narrative form.

[20] *See also Digitech Image Techs., LLC v. Elecs. For Imaging, Inc.*,758 F.Supp.3d 1344 (Fed. Cir. 2014) (claims for a method of organizing information using mathematical correlations invalid under § 101; *Walker Digital, LLC v. Google, Inc.*, No. 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014) (claims to an abstract idea paired with a general-purpose computer violate §101); *Eclipse IP LLC v. McKinley Equip. Corp.*, No. CV 14-154-6W, 2014 WL 4407592 at *12 (C.D. Cal., Sept. 4, 2014) (same); *Loyalty Conversion Sys. Corp. v. American Airlines, Inc.*, No. 2:13-cv-00655, 2014 WL 4364848, at *14 (E.D. Tex., Sept. 3, 2014) (same); *Every Penny Counts, Inc. v. Wells Fargo Bank, N.A.,* No. 8:11-cv-2826, 2014 WL 4540319 (M.D. Fla. Sept. 11, 2014).

Here, the '003 inventors *admit* the generic nature of any programming related to the "processing device" functions. *See* '003 patent, Col 25, Lines 17-24 (italics added):

> The central processing computer 103 will then, at step 133, process the information and/or data pertinent to the transaction and to the particular account. *The central processing computer 103 may utilize any of the widely known data processing and/or software routines, which are known to those skilled in that art,* in order to process transaction requests and/or authorizations involving the use of the respective account(s) and/or related card(s).

The conclusion follows that the asserted claims contain only a generic or general purpose computer since the '003 Patent specification admits that the software needed to operate the computer processing device functions were "*widely known data processing and/or software routines, which are known to those skilled in that art. . . .*"

> ### d. Claiming the Use of the Internet Does not Add an "Inventive Concept" to the Asserted Claims.

There is, of course, one claim limitation that Mr. Ashley could not have done before the late 1980s: communicate with his customer over the Internet. But, as explained more fully in the §103 section below, using the Internet to operate prior art applications is and has been for nearly twenty years an obvious modification of the prior art that does not supply an inventive concept to an otherwise un-patentable idea.

For §101 purposes, using the Internet to transmit signals in 1996 cannot "transform the nature of the claim into patent-eligible application" or provide the searched-for "inventive concept. " *Alice Corp.* at 2355. In *Soverain Software LLC v. Newegg Inc*., the Federal Circuit cited *Muniauction, Inc. v. Thomson Corp*. as holding that using the Internet to operate prior art applications was no more than an obvious modification of the prior art. 705 F.3d 1333, 1340 (Fed. Cir. 2013), *cert. denied*, 2014 WL 102440 (2014) (*citing* 532 F.3d 1318, 1327 (Fed. Cir. 2008) ("conducting previously known methods through an Internet web browser was obvious as it amounted to no more that applying the use of the Internet to existing electronic processes at a

time when doing so was commonplace")).  Notably, the applications for the patents at issue in *Newegg* -- U.S. Pat. Nos. 5,715,314, 5,909,492 and 7,272,639 -- were filed in 1994 and 1995, a time during which the *Newegg* court found that using the Internet for "existing processes" was "commonplace." *Id*. Under *Newegg*, using the Internet to carry signals related to remote banking did not provide any patentable subject matter to the otherwise unpatentable ideas in the asserted claims.  The claims are invalid under § 101.

**B.      The Asserted Claims are Invalid Based on Obviousness Under 35 U.S.C. § 103.**

**1.      Obviousness In General.**

35 U.S.C. § 103(a) renders invalid as obvious patents for which "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."

Obviousness is a question of law based on the underlying facts.  *Soverain Software*, 705 F.3d at 1336.  The factors to determine obviousness are: (1) the scope and content of the prior art; (2) the difference between the prior art and the claimed invention; (3) the level of ordinary skill in the field of the invention; and (4) any relevant objective considerations.  *Id., citing Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

If a technique has been used to improve one device and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, then using the technique is obvious unless its actual application is beyond that person's skill.  *Fresenius USA, Inc. v. Baxter Intern., Inc.*, 582 F.3d 1288, 1301 (Fed. Cir. 2009).  Further, "[w]here the problem is known, the possible approaches to solving the problem are known and finite, and the solution is predicable through use of a known option, a solution that is obvious to try may indeed be

obvious." *In re Brimonidine Patent Litig.,* 643 F.3d 1366, 1375 (Fed. Cir. 2011) (internal quotation omitted). In an obvious-to-try analysis, "[t]he important question is whether the invention is an identified predictable solution and an anticipated success." *Rolls-Royce, PLC v. United Technologies Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010). A patent is invalid, therefore, where it applies an obvious, commonly-used technique to improve an existing device or identifies a predictable solution with anticipated success.

> **2. The Asserted Claims Are Invalid As Obvious Because the Only Real Distinction Plaintiff Has Made Between the Cited Prior Art and the Claim is Using the Internet as a Means of Sending Information.**

Jack Henry's experts have submitted a report and claim chart making a prima facie case for each element of each Asserted Claim that (the Fulton '052 patent and its embodiment by Huntington Bank) and Jack Henry's pre-1996 Cash Management system combined with the Internet Banking Publications, render the Asserted Claims obvious.[21] JBTS' sole serious challenge in opposition is that a POSITA would not have been motivated to utilize the Internet for Fulton or Cash Management before August 8, 1996, the '003 patent's priority date. But despite this, summary judgment is proper because (1) use of the Internet was obvious in 1996 as a matter of law; and (2) it is undisputed that people were already utilizing the Internet for banking transactions before August 8, 1996.

> **3. The Use of the Internet in 1996 was Obvious as a Matter of Law.**

In *Newegg*, *supra*, the Federal Circuit overturned a JMOL as to non-obviousness of three patents. The Court held that using the Internet to operate prior art applications was no more than an obvious modification of the prior art. *Newegg*, 705 F.3d at 1340 (in the context of a patent with a priority date of 1996, it was obvious to adapt the prior art to known browser capabilities

---

[21] Dr. Kursh's and Mr. Fulton's Invalidity Reports are attached as Stitt Decl., Exs. 1 and 18.

when these capabilities became commonplace); *see also Muniauction,* 532 F.3d at 1327 ("conducting previously known methods through an Internet web browser was obvious as it amounted to no more that applying the use of the Internet to existing electronic processes at a time when doing so was commonplace").

The facts of *Newegg* are almost identical to the issue presented here and instruct that summary judgment is appropriate. In *Newegg,* plaintiff Soverain Software sued Newegg for patent infringement based on an online shopping platform. At trial, Newegg's expert presented testimony comparing the asserted claim with a prior art system, "CompuServe Mall" on an element by element basis, opining that it was invalid. *See Newegg*, 705 F.3d at 1338. Soverain's expert opined the CompuServe reference lacked two elements of the asserted claims: (1) that it lacked a product identifier message, clause; and (2) that it lacked a "shopping cart database." *Id*., at 1339. He did not dispute Newegg's expert that the remaining elements were met.

Soverain argued that the "product identifier message, clause" limitation was missing, from the CompuServe reference because the system claimed in its patents was adapted to the Internet, whereas the CompuServe reference relied on a pre-Internet network. *Id*. at 1340. The Federal Circuit flatly rejected this argument, quoting from its previous decision in *Muniauction,* and stating:

> "[C]onducting previously known methods through an Internet web browser was obvious because it amounted to no more than applying the use of the Internet to existing electronic processes at a time when doing so was common place." *Id.* at 1340.

The Court reversed the district court's finding that Newegg had failed to present a *prima facie* case of obviousness. Because using the Internet was obvious, Soverain's expert "did not provide evidence to rebut Newegg's prima facie case that every claim element was embodied in the prior art." *Newegg* 705 F.3d. at 1341.

26

The same facts are present here. Jack Henry's experts Dr. Kursh and Mr. Fulton have made a *prima facie* case of invalidity under §103. Like Newegg's expert, they have provided an element by element basis for their invalidity opinions. And like Soverain's expert, the only aspect seriously challenged by JBTS' expert, Mr. Cheng, is that a POSITA would not have been motivated to utilize the Internet for Fulton and Jack Henry's pre-1996 Cash Management System which, like the CompuServe reference, utilized a pre-Internet network. Under these facts summary judgment is appropriate, because the Federal Circuit has squarely held that using the Internet to perform previously known methods was well known before 1996 and obvious as a matter of law. *Newegg*, 705 F.3d at 1333; *Muniauction,* 532 F.3d at 1326-27.

Mr. Cheng also asserts that Fulton and other references "taught away" from using the Internet.[22] But Mr. Cheng misunderstands or misapplies the "teaches away" concept. Simply because a reference mentions one way of doing something and does not mention another is not "teaching away."

A reference is said to teach away when a POSITA, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a divergent direction from the path taken by the reference in question. *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994), *citing United States v. Adams,* 383 U.S. 39, 52 (1966) ("known disadvantages in old devices which would naturally discourage the search for new inventions may be taken into

---

[22] Mr. Cheng does not claim that pre-1996 Cash Management taught away from using the Internet. He simply concludes from the fact that "by August 8, 1996, development of Internet based banking systems had been going on for at least a year at Jack Henry, [y]et at least until the end of 1996, work was still being performed on the non-Internet version of Cash Management," that Jack Henry was not motivated "to combine Cash Management with the Internet." (Cheng Validity Report, Para. 376 at p. 173, Stitt Decl., Ex. 4). The conclusion is, of course, contradicted by the evidence he uses to support it – Jack Henry had been working since 1995 to develop an Internet-based banking system and was still doing so in 1996, which is conclusive support for the fact that Jack Henry *was* motivated to use the Internet.

account in determining obviousness). And if references taken in combination would produce a "seemingly inoperative device," such references teach away from the combination. *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed.Cir.2001). But the prior art's disclosure of more than one alternative does not constitute a teaching away from any of these alternatives where such disclosure does not criticize, discredit, or otherwise discourage the solution being considered. *In re Daniel S. Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004).

So, Mr. Cheng is simply wrong when he says that Fulton "teaches away" from using the Internet because it uses a modem-to-modem communications link. Nothing in Fulton (or any other cited reference) discourages using the Internet to communicate, in the area of banking transactions or otherwise.

There is also no dispute that the Internet was being used in financial and banking platforms before August 8, 1996. In addition to the articles cited by Dr. Kursh and Mr. Fulton, there is undisputed testimony that in 1993, Stanford Federal Credit Union had already some of the same banking services that JBTS contends infringe the Asserted Claims. For example, asserted claim 30 contains a limitation requiring the transmission of "a limitation or restriction regarding a banking transaction." JBTS's expert claims that the accused NetTeller Online banking satisfies this element, opining:

> The "make payment" instruction is an example of a limitation on the use of a checking account, and provides bounds within which a transaction on the checking account is allowed, and outside of which the transaction is prohibited.

Assuming for the purposes of this motion that a "make payment" instruction is a "limitation or restriction," it is undisputed that Stanford Federal Credit Union offered this same function for loan payments and check withdrawals over the Internet in 1994. *See Tuohey* deposition, *supra* and Exs. 1, 2 and A to that deposition. (Stitt Decl., Ex. 3) It is therefore undisputed that that the same technology in the asserted claims was being practiced over the

Internet prior to August 8, 1996. Accordingly, under *Newegg* and *Muniauction*, the later use of the Internet is obvious as a matter of law.

Because this is the only limitation seriously disputed by JBTS' expert in Mr. Fulton's and Dr. Kursh's *prima facie* case of obviousness, JBTS cannot present any evidence rebutting Jack Henry's prima facie case of obviousness and summary judgment is appropriate.

      **4.     A POSITA Would Have Been Motivated to Utilize the Internet for Banking Services Before August 8, 1996.**

According to Mr. Cheng, a POSITA would not have been motivated to put a functioning banking system on the Internet on August 8, 1996 because (1) security was inadequate; (2) there was no guarantee of bandwidth on the Internet; (3) the Internet was not sufficiently reliable; and (4) he had concerns about support.[23]  Of these reasons, Mr. Cheng primarily focused on his opinion that the Internet was not reliable, relying exclusively on a 19 hour server outage experienced by AOL on August 7, 1996, the day before, the application date at issue here.  Mr. Cheng opined that due to the headlines generated by the outage, "a person of ordinary skill in the art would not be motivated to put a functioning system on the Internet"[24] on August 8, 1996.

Because Mr. Cheng did not challenge any other portion of Dr. Kursh's opinion that Cash Management and the Internet Banking Publications invalidate the Asserted Claims as obvious under Section 103, the only issue to determine is whether a POSITA would be motivated to utilize the Internet on or before August 8, 1996 for banking transactions.

Mr. Cheng's opinion that a POSITA would not have utilized the Internet for a functioning banking system is not supportable.  Even accepting his speculation about the AOL

---

[23] *See*, Stitt Decl. Ex. 4, Cheng Validity Report, pg. 73-74, ¶ 158.

[24] *See*, *id.*, at pg. 172, ¶ 374; pgs. 73-77, ¶¶ 158-161.

outage as true,[25] Mr. Cheng ignores what a POSITA would have done *before* August 7, 1996 the day of the outage. Stated differently, Mr. Cheng has presented no evidence to support his bare opinion that a service outage at AOL on August 7, 1996 would have dissuaded a POSITA from utilizing the Internet on August 6, 1996 or before.

And Mr. Cheng cannot credibly make such a claim because the undisputed facts show that the banking industry was utilizing the Internet for banking transactions well before 1996. In addition to the Stanford Federal Credit Union system mentioned above and the Internet Banking Publications referenced by Dr. Kursh, Mr. Cheng's own report cites to a program announced by Jack Henry in 1995 "to develop a home banking software system that would become available through the Internet and online service CompuServe." Stitt Decl., Ex. 4, Cheng Report, p. 173, ¶ 375. Thus, even Mr. Cheng's report admits that Jack Henry was motivated to join Stanford Federal and other institutions working to utilize the Internet for banking transactions before August 8, 1996.

### 5.    Conclusion – All Asserted Claims Are Obvious

A POSITA would have unquestionably been motivated to utilize the Internet for banking transactions before August 8, 1996. Entities such as the Stanford Federal Credit Union were already using the Internet for banking transactions and Mr. Cheng's report shows that even Jack Henry was motivated to utilize the Internet for banking transactions in 1995. Accordingly, the use of the Internet is obvious as a matter of law. Because this is the only element JBTS has seriously challenged in Jack Henry's prima facie case of invalidity under 35 U.S.C. § 103, JBTS

---

[25] The logic of Mr. Cheng's position would suggest that all the people working at Jack Henry and elsewhere to create more Internet-based banking products on August *6*, 1996 and before suddenly lost their motivation and quit working on their projects on August 7. There is, of course, no support for such speculation.

has failed to rebut Jack Henry's prima facie case of invalidity and summary judgment is proper finding all the Asserted Claim invalid as obvious under 35 U.S.C. § 103.

### C. Plaintiff's Final Infringement Contentions, Expert Reports And Deposition Testimony Show That Plaintiff Is Estopped From Re-Litigating Previously-Invalidated Claims.

In the *Sleepy Hollow* trial, the jury found that the claims asserted from the '725 patent were all invalid as obvious based on Jack Henry's pre-1996 Cash Management product, the Fulton '052 patent, and three other prior art patents.[26] The district court entered judgment accordingly, and the Federal Circuit affirmed. Claims 30 and 102, and the claims that depend from them, are virtually identical to claims 108 and 267 from the '725 patent. JBTS's final infringement contentions and expert report on infringement have shown that the scope of the claims here is indistinguishable from the scope of the '725 claims. Now that the Court has construed all the claims in the '003 patent, it is clear that the art that invalidated the claim in the '725 patent invalidates the claim in the '003 patent. Accordingly, JBTS is collaterally estopped from re-litigating the issue of validity as to claims 30, 317 and 414 and the accompanying dependent claims.

Plaintiff's final infringement contentions, expert infringement report and expert deposition testimony identify, for the first time, which structures of Jack Henry's products read on the claims in the '003 Patent. These disclosures, provided after claim construction, show that, relative to Jack Henry's pre-1996 Cash Management product and Fulton, both presented as prior art in the '725 litigation, the '003 patent claims' scope is substantially identical to the previously-

---

[26] Blonder, Lawlor and Deming, U.S. Nos. 5,708,422; 5,220,501 and 4,823,264.

invalidated '725 patent claims, such that the judgment of invalidity in *Sleepy Hollow* should apply here as well.[27]

Collateral estoppel can be used where a patent claim has been invalidated in earlier litigation. *See, e.g., Blonder-Tongue Labs., Inc. v. Univ. of Illinois Fdn.*, 402 U.S. 313, 333-34 (1971). As the Court knows, collateral estoppel applies where (1) the issue sought to be precluded the same as that involved in the prior action; (2) the issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment. *Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n*, 288 F.3d 519, 525 (3d Cir. 2002). In this case, prerequisites 2, 3, and 4 are uncontested. The only remaining question, therefore, is whether the "issue" presented here – the validity of the '003 claims – is the same as the previously-litigated issue – the validity of the '725 claims.

This Court stated, in footnote 34 of its Memorandum Order on claim construction (D.I. 124) that its narrowing of some claim term constructions from the '725 constructions created new issues for purposes of applying collateral estoppel. But plaintiff's final infringement contentions and expert discovery show conclusively that the issues with respect to validity of '003 claims are the same as those pertaining to the validity of '725 claims, such that the prior art presented in the '725 litigation applies equally to the evaluation of the '003 claims.

---

[27] On January 24, 2014, Jack Henry moved this Court for summary judgment, arguing that Plaintiff should be collaterally estopped from litigating '003 patent claims that are substantially similar to previously-invalidated claims in the '725 patent. On June 30, 2014, this Court entered an order denying Jack Henry's collateral estoppel motion because "the claims of the '003 patent are more narrow than those of the '725 patent," making the issue of invalidity "common to each action not substantially identical." *See* Dkt. 124, p. 20 n. 34. Defendant believes that the Court's constructions, while in some cases narrower than those in the *Sleepy Hollow* case, did not change the scope of the claims for §103 purposes. In other words, if Fulton or Cash Management invalidated the '725 claims based on the *Sleepy Hollow* constructions, they invalidate the '003 claim based on this Court's constructions. If this Court considers this motion to be more properly a motion under Fed. R. Civ. P. 60(b) for reconsideration of the Court's June 30, 2014 order, Jack Henry is prepared to present such a Motion.

48914222.3

In his infringement report, Mr. Cheng identifies specifically what he calls the "key structures" of the '003 patent claims 36. *See* Stitt Decl., Ex. 19, p. 76. These "key structures" are a "memory device," "processing device," "receiver," "transmitter," "network computer," and "communication device associated with an account holder." *See id.* p. 76-77. Mr. Cheng also identifies which structures of Jack Henry products infringe on these "key structures" of the '003 patent. These "infringing structures," include a "database," "network interface controller," "core banking systems and servers," and "device linked to a central processing computer" – all features of standard general purpose computers. Mr. Cheng opines that these structures in Jack Henry's products infringe the '003 Patent. *See* Stitt Decl., Ex. 19, p.139-155, ¶ 21.

These structures were contained in the pre-1996 Cash Management and Fulton prior art references. *See,* Affidavits of Jon Henley and John Fulton, attached as Stitt Decl., Ex. 12 & 13. Mr. Henley explains that pre-1996 Cash Management utilized all of these "key structures" as well as the "input-output" features of the asserted claims: a memory device, sending, receiving and storing instructions with regard to banking transactions, a processing device, a transmitter and a receiver, as this Court has construed those terms. Mr. Fulton and reaches the same conclusion with respect to his Fulton '052 patent and the AT&T Huntington Bank SmartPhone.

Any differences between how terms were construed in the *Sleepy Hollow Bank* case and the present case are minor and do not change the invalidity analysis. In other words, had the terms in the '725 patent been construed exactly as the terms in the '003 patent have been construed, the result would have been the same because the slightly different constructions would not have changed the components of Cash Management and Fulton that made the claims obvious.

48914222.3

For example, this Court has construed "receiver," as used in the '003 Patent, as "the part of a transaction device, central processing computer or communication device that receives signals, data or information from another device." In the *Sleepy Hollow* litigation, the receiver was defined as "a device for receiving signals or data from an outside source and converting those signals to usable form." There is no meaningful difference.[28] Nor is there any issue of fact as to whether Cash Management or Fulton used a "receiver" as defined in this action; Messrs. Fulton and Henley aver that their pre-1996 products used receivers under either construction. Stitt Decl., *See* Ex. 13 and Attachment A.

The charts attached to the Fulton and Henley affidavits show the claim limitations that have been defined by this Court, the relevant claim constructions applied here and in the *Sleepy Hollow* case, and the identification of the component of each of Fulton and pre-1996 Cash Management that relates to the relevant structure. The analysis above can be made for each limitation of the '003 claims and renders the '003 invalid based on collateral estoppel as the issue remains identical despite the narrowed claim terms in this case. Therefore, the Court should enter summary judgment based on obviousness and collateral estoppel.

**D.    Asserted Claims 30, 102, 317, 414 and 422 are Invalid For Lack Of A Written Description Of The Logical Operations Performed by the Processing Device.**

Every independent asserted claim contains multiple limitations requiring execution of logical operations of a claimed "processing device." But the '003 specification does not "contain a written description of the invention" (*e.g.*, an algorithm or software) that teaches the claimed processing device logical operations as required by 35 U.S.C. §112, ¶ 1. The specification does

---

[28] JBTS's final infringement contentions stated that the "receiver" was a "server," which was what Mr. Joao testified to in the *Sleepy Hollow Bank* action. Mr. Cheng opines that the "receiver" in NetTeller the other Jack Henry's systems is a network interface card (NIC). But it does not matter here, because all a prior art system had to have in order to meet this limitation was a device that received signals from another device.

direct a POSITA to employ "*any of the widely known data processing and/or software routines, which are known to those skilled in that art*"[29] but this, if anything, only satisfies the "enablement" requirement not the "written description requirement. *See, Ariad Pharms, Inc., v. Eli Lilly and Co.,* 598 F.3d 1336, 1346 (Fed. Cir. 2010) (a specification may enable use of [a thing] but the claims cannot "derive benefit from it" because "that was not *the invention* which [the patentee] described . . .") (*italics added*). The '003 Patent specification lacks any teaching of a sufficient algorithm or software code to meet the written description requirement and thereby support that the claimed logical operations of the "processing device" were the invention. The result is claims 30, 102, 317, 414 and 422 are invalid under 35 U.S.C. §112, ¶ 1 and all claims depending therefrom.

### 1. Raymond Joao Admitted He Lacked The Requisite Knowledge To Describe The Banking Computations Of The Processing Device.

Inventor Raymond Joao, in his 2010 trial testimony admitted that he: (1) had no knowledge of banking or banking operations; (2) had never worked in a bank; (3) had never written software for a bank; (4) had not written software for his "invention;" (5) had never used online banking; and (6) he had never used a debit card or an ATM.[30]

Mr. Joao asserted in his deposition that his specification teaches a software algorithm.[31] But the specification material he cites shows it to be only a statement of what the processing device should accomplish, and not the means for the processing device to actually perform its tasks. A written description that "amount[s] to no more than a 'wish' or 'plan'" for performing

---

[29] '003 Patent at column 25, Lines 17-24.

[30] See Stitt Decl., Ex. 5, Trial Tr., Joao Bock Transaction Systems, LLC v. Jack Henry & Associates, Inc. 03 CV. 10199 (WWE), March 5, 2010, pp. 596 – 601.

[31] Stitt Decl., Ex. 11 – '003 Patent, Figures 4 and 6a, 6b, and 6c and specification at columns 21-28.

48914222.3

the invention rather than describing the invention fails as an adequate written description. *Ariad*, 598 F.3d at 1350 (*citing Fiers v. Revel,* 984 F2d 1164, 1170 (Fed. Cir. 1993)).

This absence of teaching is supported by the inventors' own admission in the '003 specification. They state in the '003 Patent at column 25, Lines 17-24:

> The central processing computer 103 will then, at step 133, process the information and/or data pertinent to the transaction and to the particular account. *The central processing computer 103 may utilize any of the widely known data processing and/or software routines, which are known to those skilled in that art,* in order to process transaction requests and/or authorizations involving the use of the respective account(s) and/or related card(s). (*italics added*).

The '003 Patent specification admits that the software needed to operate the processing device functions is absent from the specification and that it is prior art. This is because the inventors lacked sufficient knowledge of banking operations to enable him to provide bank operations algorithms or banking software programming. Even if they did have the ability, such information is not provided in the '003 specification. The conclusion is the asserted claims are invalid for lack of written description under 35 U.S.C. §112, ¶ 1.

### 2. Teaching An Algorithm Or Software Is Necessary Under The Written Description Requirement As Logical Operations Are Claimed.

Claim 30 requires the "processing device" to perform the following operations:

> a *"processing device processes information regarding a banking transaction"*
>
> *the processing device utilizes the limitation or restriction automatically stored in the memory device in processing the banking transaction*
>
> *the processing device generates a signal containing information for allowing or disallowing the banking transaction.*

The claim 102 "processing device" is to perform the following operations:

> *wherein the processing device processes an authorization request for a transaction on the account,*

> *wherein the processing device utilizes the limitation or restriction automatically stored in the memory device in processing the authorization request, and*
>
> *further wherein the processing device generates a signal containing information for authorizing or disallowing the transaction.*

Claim 317 requires that the "processing device" process transaction information:

> *the processing device processes the transaction information and generates a signal corresponding to the transaction"*

In Claim 414 the "processing device" performs the following operations:

> *wherein the processing device processes information regarding a banking transaction,*
>
> *wherein the processing device is capable of allowing or disallowing the banking transaction, and*
>
> *further wherein the processing device generates a signal containing information regarding the banking transaction;*

The claim 422 "processing device" is to perform the following operations:

> *the "processing device determines whether a hold is placed on the at least one of a checking account, a savings account, and an automated teller machine account"*
>
> *"the processing device disallows the withdrawal from the at least one of a checking account, a savings account, and an automated teller machine account"*

None of these claimed "processing device" operations is described in the specification. In fact Mr. Joao admitted he lacked any knowledge of banking operations – knowledge he would have needed to write the software or algorithms. At best the specification skirts the issue by vaguely referring a POSTIA to "widely known data processing and/or software routines, which are known to those skilled in that art." *See Ariad*, 598 F.3d at 1350 (an adequate written description of a claimed (subject matter) requires more than a generic statement of an invention's boundaries).

48914222.3

The logical operations of the "processing device" are stated claim limitations. To be claimed a written description of those operation must be in the specification. Mr. Joao lacked the banking knowledge to supply an algorithm or software to support these limitations. And the specification itself directs a POSITA to elsewhere to *widely known data processing and/or software routines*" obtain the description of the logical operations of the "processing device" Claims 30, 102, 317, 414 and 422 are therefore invalid under 35 U.S.C. § 112, ¶ 1 for lack of written description.

## VII.    CONCLUSION

For the reasons stated above, this Court should grant summary judgment of invalidity.

Dated: September 29, 2014

Wilmington, Delaware

**POLSINELLI PC**

/s/      *Shanti M. Katona*
Shanti M. Katona (Del. Bar No. 5352)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware  19801
Telephone:   (302) 252-0920
Facsimile:  (302) 252-0921
skatona@polsinelli.com

OF COUNSEL:
Russell S. Jones, Jr.
Richard P. Stitt
Joshua M. McCaig
Polsinelli PC
Twelve Wyandotte Plaza,120 W. 12th Street
Kansas City, MO 64105
Telephone:  (816) 421-3355
Facsimile:   (816) 374-0509
rjones@polsinelli.com
rstitt@polsinelli.com
jmccaig@polsinelli.com

*Attorneys for Jack Henry & Associates, Inc.*

48914222.3

<u>**CERTIFICATE OF SERVICE**</u>

       The undersigned certifies that a copy of the foregoing pleading was served upon all counsel of record via the United States District Court for the District of Delaware's ECF Document Filing System on the 29th day of September, 2014.

Stamatios Stamoulis
Richard C. Weinblatt
Stamoulis & Weinblatt LLC
Two Fox Point Centre
6 Denny Road , Suite 307
Wilmington, DE 19809
Telephone: (302) 999-1540
stamoulis@swdelaw.com
weinblatt@swdelaw.com
*Attorneys for Plaintiff*

Jonathan R. Miller
Jacqueline K. Burt
Heninger Garrison Davis, LLC
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
jmiller@hgdlawfirm.com
jburt@hgdlawfirm.com
Telephone:  (404) 996-0863, 0861
Facsimile:  (205) 547-5506, 5502
*Attorneys for Plaintiff*

Steven W. Ritcheson
Joseph C. Gabaeff
Heninger Garrison Davis, LLC
9800 D. Topanga Canyon Blvd., #347
Chatsworth, CA 91311
Telephone: 818-274-1883
Facsimile: 818-337-0383
swritcheson@hgdlawfirm.com
jgabaeff@hgdlawfirm.com
*Attorneys for Plaintiff*

M. Blair Clinton
Heninger Garrison Davis, LLC
2224 1st Avenue North
Birmingham, AL 35203
bclinton@hgdlawfirm.com
Telephone:  (205) 327-9116
Facsimile:  (205) 380-8082
*Attorneys for Plaintiff*

Maureen V. Abbey
Heninger Garrison Davis, LLC
220 St. Paul Street
Westfield, NJ 07090
Telephone:  (908) 379-8475
Facsimile:  (205) 547-5500
*Attorneys for Plaintiff*

/s/ *Shanti M. Katona*
Shanti M. Katona (Del. Bar No. 5352)
*Attorney for Defendant*

48914222.3